

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-1184-16

### RICHARD CHARLES OWINGS, JR., Appellant

### v.

### THE STATE OF TEXAS

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FIRST COURT OF APPEALS
### HARRIS COUNTY

RICHARDSON, J., delivered the opinion of the Court in which KELLER, P.J., and KEASLER, HERVEY, ALCALA, NEWELL, KEEL, and WALKER, JJ., joined. YEARY, J., filed a concurring opinion. WALKER, J., filed a concurring opinion.

### OPINION

Appellant, Richard Charles Owings, Jr., was convicted by a jury of aggravated sexual assault of a child[1] and sentenced to thirty years in prison. The First Court of Appeals reversed Appellant's conviction, holding that "the trial court committed harmful

---

[1] TEX. PENAL CODE § 22.021(a)(1)(B)(iii), (a)(2)(B).

constitutional error in failing to require the State to make an election of the incident upon which it relied for conviction."[2]  We agree that the trial court committed constitutional error by failing to require the State to make an election of the incident upon which it relied for conviction.  However, we disagree with the appellate court's harm analysis.  We hold that, under these particular facts, the trial court's erroneous failure to require the State to make an election was harmless.  We reverse and remand the case to the First Court of Appeals to address Appellant's remaining point of error.[3]

## BACKGROUND

Appellant was the step-grandfather of the complainant, K.M.—he was previously married to K.M.'s maternal grandmother ("Grammy").  Two years after Grammy divorced Appellant, nine-year-old K.M. disclosed to Grammy that Appellant had sexually abused her on numerous occasions.  Appellant was arrested and charged with aggravated sexual assault of a child under the age of fourteen.  The indictment alleged only one incident of sexual abuse in the form of genital-to-genital contact:

> Richard Charles Owings, Jr., hereafter styled the Defendant, heretofore on or about January 1, 2010, did then and there unlawfully, intentionally and knowingly cause the sexual organ of [K.M.], a person younger than fourteen

---

[2] *Owings v. State*, 507 S.W.3d 294, 310 (Tex. App.—Houston [1st Dist.] 2016).

[3] Because the court of appeals sustained Appellant's second issue regarding the trial court's failure to require an election, it did not address Appellant's first issue concerning whether the trial court erred by allowing the State to question him about the underlying details of his prior conviction for aggravated robbery.  *Owings*, 507 S.W.3d at 310 n. 5.

years of age and not the spouse of the Defendant, to contact the sexual organ of the Defendant.

Grammy testified at Appellant's trial that she and Appellant were married for seven years—from 2003 to 2011. She said that her daughter, M.M., and granddaughter, K.M., lived with them off and on during that time. Grammy stated that she and K.M. were very close, and even when K.M. was not living with them K.M. would often spend the night. Grammy said that she first became suspicious of Appellant when he would, on occasion, spend time with K.M. in their bedroom behind locked doors. Grammy would knock on the door, and it would take a few minutes for Appellant to come open the door. Grammy remembered one Thanksgiving when K.M. came to the dinner table after she had been in their bedroom with Appellant, and she had a "terrified" look on her face.

K.M.'s mother, M.M., also testified that she remembered specific times when Appellant and K.M. were in his bedroom with the door locked. These incidents caused her to be suspicious of Appellant.

The outcry witness was Lisa Holcomb, a forensic interviewer with the Children's Assessment Center in Harris County. The following excerpt came from the trial transcript of Ms. Holcomb's testimony when she was asked to describe in detail the statements that K.M. conveyed to her about the alleged sexual abuse:

> She said because my Pawpaw, he did a horrible thing to me. His name is Richard. How is he related to you? He's my Grammy['s] husband. He would take me when my grandma would be at work. It's before my mom and dad got

together. He would take me into the bedroom, he would lock the door and get out his knife and put it by the bed. He would take my clothes off. He told me if I tried to run away, he would stab me with his knife. If I told anybody, he would hurt other little girls. She said, I asked her to tell me about the knife. She said it was like a pocketknife. He always kept it by the desk. It was silver and open. She said, he was sitting on the bed; and he told me to sit on the bed.

I said, tell me everything that happened. And she said he would push me on the bed and he would get undressed, he would do horrible things. He would get on top of me and start going up and down. He took everything off of her. I asked her where her body was. She said she fell face first. I asked what part of your body was he on? She said, he was on my private area. And that was the front of her body. . . . She said, he would turn me over. I said what part of his body—what part of his body is on your private area? And she said, his private area.

And I asked, what would he be doing while he was on you like that? She said, going up and down. And I asked what his private area was doing? She said up and down. On top of her body, she didn't like it at all. His private area, she said was hard and his hands were everywhere. And she described by motion that he was touching her at her chest at that time, and he would tell her just—he would just tell her not to move. I asked her if she was able to do anything or say anything, and she shook her head no. I asked would anything happen with his private area? She shook her head, no.

I said did you ever feel or see anything coming out of it at all? She said there was stuff coming out [of] it, and it would be on the bed. When Grammy come [sic] home, she would bang on the door and tell him to unlock the door, and he would hurry up and try to hide it with a blanket and clothes. I asked her how much it would happen? She said a lot. It happened since I was four. He stopped at eight. When she was six and seven, she explained that they moved out [but] that they were still visiting Grammy a lot.

She also disclosed another incident. She related to a time when she was staying in her Uncle Ty's room, and that her Grammy and her mom went to another room. They were spending the night. Her Pawpaw came in there with his knife, and at that time, he made her do something different, which she

explained was that he took my head and he made me put my mouth on his derriere. He walked in the room, put his knife on the desk, took off his clothes and hers. After that he went up and down on me, then he made me put my mouth on his private area. And I asked where her body, where [*sic*] when uncle walked in, and she described his was on the pillow, I was right by his private. He was making me put my mouth on his private. And she said he took my head and was jamming on it, and at that time she demonstrated by motioning her hand to the back of her head. She said the room was very dark. The TV was on, and she explained that he hid their clothes somewhere. And when my uncle came in, he had just walked in there, looked at them, closed the door and walked away. And Pawpaw hurried up and put his clothes on. She said she was about five or six at that time.

* * *

Then she described the last incident; she was detailed as saying that this was the time that he had gotten kicked out of his apartment . . . .

K.M. testified that Appellant's sexual abuse of her was ongoing. Although the court of appeals viewed K.M.'s testimony as describing four single separate incidents, we read K.M.'s testimony differently. The first "incident" K.M. talked about, which was consistent with Lisa Holcomb's testimony, was actually a description of what consistently happened on numerous occasions when Appellant took her into his bedroom and locked the door. K.M. used words describing how Appellant "would do" the same thing each time: "He would take my clothes off" (she said she "would usually wear pants"); "he'd take [his clothes] off;" he would "put me on the bed;" "he would get on top of me;" and "stick his penis in my vagina." K.M. also described how Appellant "would put the knife on the night stand" and threaten to hurt her or someone else if she told anyone: "Once he was on top of me before he stuck his

penis in my vagina, he would show me the knife." K.M. described how she "would just lay there." When asked "if Grammy was home at all during this time," K.M. responded by saying, "sometimes when it, when she would come home, that's when it stopped because there was a lock on the door, so he would always lock it and so she would bang on the door." K.M. emphasized that he "always" locked the door. When Grammy would "bang on the door," K.M. said that Appellant "would hurry up and put his clothes on and have me put my clothes on."

K.M. then mentioned three other specific incidents when Appellant did "the same thing" to her that he always did—take off her clothes, take off his clothes, and put his penis in her vagina. But on those other three instances, he also forced her to perform oral sex on him. The first instance she described occurred "in Grammy's room," when Appellant did "the same thing that he did the first time, but this time he had [K.M.] put [her] mouth on his penis . . . . First, he would do the same thing as he would do, then all of a sudden he forced my mouth on his penis." Another time, she was in her Uncle Ty's room. She said she thought it "might have been the only time someone was there at the house, and [she] was there in [her] uncle's room, and [she] was watching a movie, and it was dark outside, and [Appellant] came in and he did, he did both things to [her]." She described how, on that occasion in her uncle's bedroom, Appellant took off her nightgown, he got on top of her, and he put his penis in her vagina, and then after that he put his penis in her mouth. K.M. then

described a third distinct occasion when Appellant took her to his father's house. He and Grammy were divorced. He picked K.M. up from her mother's apartment, purportedly to take her to an arcade. Instead, Appellant took K.M. to his father's house. She described how he "took [her] to his bedroom;" and "stuck his penis in [her] vagina, and he put [her] mouth on his penis."

K.M. testified that, when asked a few times by her mother and grandmother—who were both clearly suspicious of Appellant's behavior with K.M.—if anyone was touching her inappropriately, K.M. would deny that anything out of the ordinary was going on. K.M. said she did this because she was afraid of Appellant and what he might do to her. K.M. said that it was only after Appellant moved out of Grammy's house that she felt safe enough to disclose the sexual abuse to Grammy.

After the State rested, defense counsel requested that the trial court force the State to elect which "one" of the "four" incidents they will be relying on to convict. The trial court denied the election request.

Appellant then testified in his defense. He denied committing any sexual abuse against K.M.:

Q.    Did you ever have occasion to do anything sexually inappropriate [to K.M.]?

A.    No.

Q.   Did anything like that ever occur when [K.M.] was five in your bedroom?

A.   Absolutely not.

Q.   Did you ever point a knife at her?

A.   Never.

\* \* \*

Q.   Did you threaten to harm other children?

A.   Never.

Q.   Did you threaten to harm any animals?

A.   I would never do that.

Q.   [K.M.] also described another occasion when the same thing happened; do you remember her talking about that?

A.   Yes, I do.

Q.   Did that ever happen?

A.   No.

Q.   Do you know what time, date, place, season she was even referring to?

A.   Not really.

Q.   She also talked about an experience in Tyler's room. Did you ever do anything inappropriate to [K.M.] in Tyler's room?

A.   No.

Q.     On any occasion?

A.     No, sir.

\* \* \*

Q.     And you heard an occasion where [K.M.] told us about what happened at your father's house.  Did anything happen between you and [K.M.] in your father's house?

A.     It did not.

On cross examination, Appellant theorized as to why K.M. might have been lying about being sexually abused by Appellant:

A.     What I'm saying is apparently when she's been asked the same question by her grandmother repeatedly and her response isn't good enough, eventually she's going to say something else.  So she went ahead and complied; and I think it built up from there.  And bless her heart, she's in a position now, she's talked herself in a position she has to defend.

Q.     So, you're not saying [K.M.] is lying, you're just saying [her grandmother] has been coaching her?

A.     Yes, [her grandmother] has encouraged her to say this. . . .  She's getting a lot of positive attention. . . .  She's getting a lot of care and attention.  She's getting a lot of special treatment, positive reenforcement, I guess you could say.

Q.     But she got that beforehand with you is what you just told me?

A.     Poor her, I guess, she's a victim now.  So she's the star of her own little drama, right?

\* \* \*

Q.      She's just lying about the sex abuse?

A.      That's right.

The jury convicted Appellant of aggravated sexual assault of a child and sentenced him to 30 years in prison. However, the First Court of Appeals reversed Appellant's conviction and remanded the case for a new trial.[4] It held that the trial court committed harmful constitutional error when it failed to require the State to elect which specific instance of sexual abuse it relied upon for conviction.[5] The State filed a petition for discretionary review, claiming that the trial court's failure to require an election by the State should not have resulted in a reversal because, even if it was error, it was harmless. For the reasons set out below, we agree with the State that the error was harmless.

## ANALYSIS

When one particular act of sexual assault is alleged in the indictment, and more than one incident of that same act of sexual assault is shown by the evidence, "the State must elect the act upon which it would rely for conviction."[6] Once the State rests its case in chief, upon

---

[4] *Owings*, 507 S.W.3d at 310.

[5] *Id*. at 310.

[6] *O'Neal v. State*, 746 S.W.2d 769, 771 (Tex. Crim. App. 1988); *Phillips v. State*, 193 S.W.3d 904, 910 (Tex. Crim. App. 2006) (reaffirming *O'Neal*); *Dixon v. State*, 201 S.W.3d 731, 733–34 (Tex. Crim. App. 2006).

a timely request by the defense, the trial court must order the State to make an election.[7]

In this case, the indictment alleged one offense describing one act of genital-to-genital contact. However, K.M. testified that Appellant put his penis in her vagina on numerous occasions. Hence, she testified to more than one act of genital-to-genital contact. Therefore, because the defense made a timely request, we agree with the court of appeals that the trial court erred by not requiring the State to elect the act of genital-to-genital contact upon which it would rely for a conviction.[8]

The erroneous failure to require the State to make such an election is a constitutional error.[9] The issue we must decide is whether this error was harmful or harmless. When conducting a constitutional harm analysis of an election error, the reviewing court must reverse a judgment of conviction "unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment."[10] This Court has held that this determination is made by analyzing the error in the context of the following four purposes

---

[7] *Phillips*, 193 S.W.3d at 909 ("In reexamining *O'Neal*, we find no reason to deviate from our holding that a trial court errs by failing to have the State elect at the close of its evidence when properly requested by the defense.").

[8] *Owings*, 507 S.W.3d at 304. Article 38.37 of the Code of Criminal Procedure, which permits the admission of extraneous offense evidence, does not restrict a defendant's right to have the State elect the incident for which it will seek a conviction. *Id.* at 300 (citing *Phillips*, 193 S.W.3d at 911–12). Moreover, the jury charge does not serve "as a *de facto* election" because it is given too late in the trial to afford a defendant the requisite notice to defend. *Id.* (citing *Phillips*, 193 S.W.3d at 912).

[9] *Phillips*, 193 S.W.3d at 914.

[10] TEX. R. APP. PROC. 44.2(a).

underlying the election requirement:

- to protect the accused from the introduction of extraneous offenses;

- to minimize the risk that the jury might choose to convict, not because one or more crimes were proved beyond a reasonable doubt, but because all of them together convinced the jury the defendant was guilty;

- to ensure unanimous verdicts; that is, all of the jurors agreeing that one specific incident, which constituted the offense charged in the indictment, occurred;

- and to give the defendant notice of the particular offense the State intends to rely upon for prosecution and afford the defendant an opportunity to defend.[11]

Thus, in order to find beyond a reasonable doubt that the erroneous failure to require an election was harmless (i.e., it did not contribute to the conviction), we must determine that these four purposes behind the election requirement were still met.

**A.** __The First Purpose:  To protect the accused from the introduction of extraneous offenses__

Evidence of other crimes, wrongs, or acts committed by Appellant against K.M. were admissible for purposes of showing the state of mind of Appellant and K.M., and the previous and subsequent relationship between them.[12]  For that reason, Appellant was not

---

[11] *Phillips*, 193 S.W.3d at 910 (internal citations omitted); *see also O'Neal*, 746 S.W.2d at 772–73 ("Where the State fails to elect at the resting of its case in chief, a defendant might find himself without notice as to which of a multitude of acts he might be called upon to defend.").

[12] TEX. CODE CRIM. PROC. art. 38.37, §§ 1(1), 2(2); *Dixon*, 201 S.W.3d. at 734–35.

entitled to protection from the introduction of evidence of extraneous offenses involving

K.M.[13]

Nevertheless, the defense requested, and the trial court gave, a limiting extraneous

offense instruction under Texas Code of Criminal Procedure, Article 38.37:

> Ladies and gentlemen, you are instructed that evidence of other crimes, wrongs, or acts committed by the Defendant against the child who is the victim of the alleged offense in this indictment shall be admitted for its bearing on relevant matters including the state of mind of the Defendant and the child and the previous and subsequent relationship between the Defendant and the child.

Therefore, the jury was made aware that evidence of acts of sexual abuse other than genital-

to-genital contact could only be considered for the limited purpose as instructed.  Thus, the

failure to require an election did not prevent the first purpose from being met.

**B.**     **The Second Purpose:  To minimize the risk that the jury might choose to convict, not because one or more crimes were proved beyond a reasonable doubt, but because all of them together convinced the jury the defendant was guilty**

In the case of *Dixon v. State*, the child complainant testified that the act of sexual

abuse occurred "one hundred times," and except for one time during the day, the abuse

always occurred at night.[14]  In *Dixon*, we held that the second purpose was met because

"[t]he 'multiple offenses' were all recounted by the same source—the child."[15]  In this case,

---

[13] *Dixon*, 201 S.W.3d at 734–35.

[14] *Id.* at 732.

[15] *Id*. at 735.

as in *Dixon v. State*, "we see no risk the jury found [A]ppellant guilty of an offense that was not proven to its satisfaction beyond a reasonable doubt."[16] All of the incidents of sexual abuse in this case were recounted by the same source—K.M. This case did not involve the presentation of evidence of different activities from different sources that a jury might perceive to "add up" to the defendant being guilty even though no individual offense was proven beyond a reasonable doubt.[17]

In closing argument, although the prosecution brought up the testimony of other witnesses, the prosecutor emphasized that those witnesses provided "background" information which lent credibility to K.M.'s version of events. Grammy's testimony told about "all of those times that the door was locked and she would bang and bang and bang for him to open that door while they were in that room, and it took him forever to get there." K.M.'s mother, M.M., gave the jurors "the context of the relationship between the two of them" and told the jurors about "those instances where she tried to open the door and it would be locked."

There was very little variance in how K.M. described the genital-to-genital contact. And, but for the times when K.M. said Appellant put his penis in her vagina *and* she was also forced to perform oral sex, she described a sequence of events that happened repeatedly in

---

[16] *Id.*

[17] *Id.*

the same way and under the same circumstances in the same place. In closing argument, the prosecution emphasized that K.M. was "consistent in her testimony" when she was "describing the same thing," and that the genital-to-genital contact occurred "all the time," "in that room," where K.M. would lay there "stiff."

K.M. described repeated genital-to-genital contact that occurred in Appellant's bedroom, and the indictment alleged only genital-to-genital contact. Despite certain varying details, these acts of abuse could reasonably be viewed as a general pattern. Therefore, whether the sequence of events—they were behind locked doors, in Appellant's bedroom, he took off her clothes, he took off his clothes, her put her on his bed, and he put his penis in her vagina—"was alleged to have occurred one, ten, fifty, or one hundred times does not by itself impact the believability of the child's story."[18] K.M. was either credible or she was not; she described the ongoing, repeated instances of genital-to-genital contact with enough detail to support a finding of guilt. We hold that the second purpose was met.

**C.**     **The Third and Fourth Purposes:  To ensure a unanimous verdict and to give the defendant notice of the particular offense the State intends to rely upon for prosecution and afford the defendant an opportunity to defend**

Likewise, we are confident that the State's failure to elect did not result in a non-unanimous verdict. As noted above, the prosecution clearly focused on the same act of

---

[18] *See id*. ("[S]he described the manner in which appellant sexually assaulted her and said that it occurred numerous times. Consequently, *all* of the incidents presented in the case were presented with equal specificity, . . . .").

genital-to-genital contact that K.M. said occurred on numerous occasions in Appellant's bedroom. The court of appeals believed the facts of this case more closely paralleled those in *Phillips v. State*, because "it was completely unclear to the jury which act the State would rely upon for conviction."[19] We disagree. Although, theoretically, it could be said that some jurors could convict based only on the one incident in Uncle Ty's room, some jurors could convict based only on the one incident in Appellant's father's house, and some jurors could convict based only on one of the multiple incidents in Appellant's bedroom, the likelihood of that is almost infinitesimal. The prosecution's case depended on the credibility of K.M. Appellant's defense was that the sexual abuse did not occur at all. There is no basis anywhere in the record for the jury to believe that one incident occurred and another did not. Either they all did or they all did not. Thus, unlike in *Phillips*, there was no danger here that some jurors might have believed that one incident occurred and another or others did not.[20] Although K.M.'s testimony supports a finding that Appellant's sexual organ contacted her sexual organ on the other occasions when there was also mouth-to-genital contact, it is highly

---

[19] *Owings*, 507 S.W.3d at 307.

[20] *Phillips v. State*, 193 S.W.3d 904, 913 (Tex. Crim. App. 2006). In *Phillips*, the complainant testified that oral contact of her sexual organ and digital penetration of her sexual organ first occurred at the appellant's apartment and also occurred at a motel on a specific date. We held that the trial court's error in failing to require the State to elect was harmful constitutional error because the complainant had given more than one detailed account for each type of offense. *Id.* at 907, 914. Specifically, the purpose that was not satisfied was the one requiring jury unanimity. The danger was that six jurors could convict on the basis of one of the detailed incidents and six could convict on the basis of the other detailed incident. *Id.* at 913.

unlikely that any juror voted to convict Appellant because they believed that one of those acts occurred and the acts in Appellant's bedroom did not.

We find, therefore, that the jurors would not have convicted Appellant without unanimously believing that he committed sexual assault in the form of genital-to-genital contact in Appellant's locked bedroom in the manner described by K.M. Thus, we are satisfied that, despite the trial court's failure to require an election by the State, there is "no remotely significant risk" of a non-unanimous verdict.[21]

We also perceive no risk that Appellant was deprived of adequate notice of which offense to defend against. Appellant's defense was the same as to each incident K.M. testified to—that no sexual abuse occurred at all.[22] Appellant's defense was a blanket denial that any incident of sexual abuse happened. Appellant did not have different explanations for the different incidents. He had no alibi for any of the alleged incidents. Therefore,

---

[21] *See Dixon*, 201 S.W.3d at 735–36 (finding it "obvious from this record" the incident that supported the jury's verdict, and also finding that "there is no remotely significant risk, under the facts of this case, that a jury would convict appellant without believing that he committed an offense at night.").

[22] During closing argument, defense counsel suggested several reasons why K.M. would fabricate her accusation. First, he argued that K.M. felt pressured by Grammy to make up the story of sexual abuse because Grammy repeatedly asked K.M. if she was being abused. Defense counsel then argued that K.M. was acting out as a result of being exposed to domestic violence between her mother and her father and step-father. He suggested that K.M. was traumatized by moving around a lot as a child. He reminded the jurors that depression and bipolar disorder run in the family. Then defense counsel suggested that the separation of primary male figures in the home caused K.M. anxiety. All of these supposed traumatic events that occurred in K.M.'s past were presented as possible motives for K.M. to lie about being abused by Appellant.

Appellant's defense was not inhibited by the error and he was not deprived of proper notice or the opportunity to defend.

The issue at trial was whether the jury believed K.M. or whether the jury believed Appellant. As we noted in *Cosio v. State*, Appellant's "defense was that he did not commit any of the offenses and that there was reasonable doubt as to each of the four incidents because [the complainant] was not credible . . . . His defense was essentially of the same character and strength across the board." [23] And in this case, as in *Cosio*, "[t]he jury was not persuaded that [Appellant] did not commit the offense or that there was any reasonable doubt. Had the jury believed otherwise, they would have acquitted [Appellant] . . . ." K.M. was either credible or not. The additional acts of genital-to-genital contact described as occurring with the additional unindicted acts of oral sex, all described in the latter three incidents, did not make K.M.'s testimony any more or less credible.[24] Although there was no election, the third and fourth purposes behind the election requirement were still met.

---

[23] *Cosio v. State*, 353 S.W.3d 766, 777–78 (Tex. Crim. App. 2011). Although in *Cosio*, we applied the jury charge error standard of review under *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1985), as opposed to the constitutional error standard of review under Texas Rule of Appellate Procedure 44.2(a), the considerations of notice and jury unanimity were still relevant to our harm analysis.

[24] In *Arrington v. State*, "appellant denied that he had ever seen the [complainant] naked or that he had any inappropriate sexual contact with her." *Arrington v. State*, 451 S.W.3d 834, 842 (Tex. Crim. App. 2015). His defense was that the complainant's mother prompted the complainant to lie about the alleged sexual abuse. *Id*. at 842. Thus, the jury's verdict was a complete rejection of Appellant's defensive theory. *Id*. There was no risk that the jury's verdict was not unanimous.

## **CONCLUSION**

This was not a difficult decision for the jury. The "Filed" stamps on the last page of the jury charge and on the verdict form indicate that the jury deliberated for two hours and twenty minutes—the court record reflects that the jury retired to deliberate at approximately 11:27 a.m., and they reached a verdict at 1:47 p.m. There were no notes sent out by the jurors indicating confusion of the issues or disputes over testimony, and there was no indication from the jurors that they were not unanimous about which incident was the charged offense. Moreover, there was no dispute regarding K.M.'s age at the time of the alleged abuse. She was well under the age of 14 when all of the alleged sexual abuse occurred. After examining the record, we are confident beyond a reasonable doubt that the error in failing to require an election was harmless—it did not contribute to Appellant's conviction. Consequently, we reverse the judgment of the First Court of Appeals and remand this case to that court to address Appellant's remaining point of error.

DELIVERED:      November 1, 2017

PUBLISH