**Affirmed and Opinion Filed June 15, 2022.**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-19-01367-CR**

**DONALD NOLAN LEHMAN, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 7**
**Dallas County, Texas**
**Trial Court Cause No. F-1876726-Y**

## MEMORANDUM OPINION

Before Justices Myers, Partida-Kipness, and Pedersen, III
Opinion by Justice Partida-Kipness

Appellant Donald Nolan Lehman appeals his conviction on one count of aggravated sexual assault of a child younger than fourteen years of age. In two appellate issues, Lehman contends the conviction should be reversed and a judgment of acquittal rendered because the evidence was insufficient to support the conviction and charge error caused him egregious harm. Alternatively, he seeks reversal and remand for a new trial. We overrule his appellate issues and affirm the judgment.

## PROCEDURAL HISTORY

The grand jury indicted Lehman on a charge of aggravated sexual assault of a child under the age of fourteen. *See* TEX. PENAL CODE § 22.021(a)(2)(B). The

indictment alleged that on or about July 4, 2017, Lehman intentionally and knowingly caused the contact of L.D.'s female sexual organ by his sexual organ, and L.D.[1] was younger than fourteen at the time of the offense. Lehman pleaded not guilty, and the case proceeded to trial. A jury found Lehman guilty of the charged offense and sentenced him to twenty-five years' imprisonment. Lehman filed a motion for new trial, which was overruled by operation of law. This appeal followed. Because both appellate issues pertain to Lehman's conviction for aggravated sexual assault of a child, we limit our discussion of the facts and the evidence accordingly.

## BACKGROUND

L.D. was born August 26, 2005. In July 2018, when L.D. was twelve years old, she attended a church camp near Austin, Texas,. Molly Wilson, a youth minister at Lake Pointe Church in Rockwall, Texas, was serving as a minister at the camp. L.D. approached Wilson after a breakout session in which the ministers and counselors educated the female campers about sexual abuse. Wilson testified that L.D. seemed "very upset, almost terrified." According to Wilson, L.D. told her that L.D. and her family "were threatened if she were to say anything about what happened." Wilson testified that she believed L.D. was crying and felt threatened "[b]ecause someone had sexually abused her, potentially raped her, and she was

---

[1] To protect the identity of the minor complainant and any child witnesses, we use initials or pronouns to identify L.D., each child involved in these proceedings, and defense witnesses other than Lehman. *See* TEX. R. APP. P. 9.8(b)(2).

terrified to tell anyone because she thought harm would come to her, harm would come to family if she told anyone." As a mandatory reporter, Wilson believed that L.D. disclosed enough information to require Wilson to make a report with the State. She filed a report on-line with the Texas Department of Family and Protective Services.

On July 17, 2018, Jessica Parada[2], a forensic interviewer with the Dallas Children's Advocacy Center (DCAC), interviewed L.D. During that interview, L.D. reported two incidents of abuse by Lehman and told Parada that Lehman was her father's friend. At trial, L.D.'s mother testified that Lehman had been "a close friend" of her and her husband, and their children considered Lehman "as their uncle."

L.D. told Parada the first incident happened when she was ten years old and the second happened when she was twelve years old. When the first incident occurred, Lehman was living with L.D. and her family. L.D. told Parada that Lehman took L.D. into his room, showed L.D. "his private part," and pulled down her pants. L.D. explained that by "private part" she meant "the part where a man pees from" and she described what it looked like. Parada concluded that L.D. "was talking about the penis."

---

[2] After an outcry hearing, the trial court designated Parada as the outcry witness. Lehman does not appeal that ruling.

L.D. disclosed that Lehman took his shirt off, put her on the bed, pulled down her shorts, and then was "putting it in me," meaning his penis. L.D explained that "in her" meant that his private part "was going in the middle part… [that she] used to pee." Parada understood L.D. to mean in her vagina. L.D. described how it felt when the penis was in her vagina. She described it as "nasty weird" and "she said her middle part could feel like something was inside." According to Parada, L.D. said the first incident occurred when she was ten years old, which Parada believed was "probably around 2016." L.D.'s mother confirmed in her testimony that Lehman and his son, C.L., lived with L.D. and her family in either 2015 or 2016. L.D. turned ten on August 26, 2015.

L.D.'s second outcry concerned an incident that occurred during a visit to Lehman's home with her sisters. During that visit, Lehman asked L.D. if she wanted to go to Walmart with him, and she said yes. L.D.'s sister asked to go too, but Lehman said no. L.D. reported that Lehman drove her to Walmart, they bought some things, and then Lehman drove her to the mechanic's shop where he worked. Lehman put away the dogs that live at the shop "so they didn't bite her," and then he got a blanket and put it on the tailgate of a truck in the shop. L.D. told Parada that Lehman then "put me on top of the blanket and then he did the same thing like when I was 10."

According to Parada, L.D. talked about it hurting when Lehman put his penis in her vagina. L.D. also said that Lehman "took his hand and opened her vagina with

–4–

his fingers" and also he was "putting his tongue on her vagina." L.D. used the term "middle part" throughout the interview rather than vagina. Parada again clarified with L.D. what she meant by "middle part," and Parada understood L.D. to mean her vagina. L.D. told Parada that she "could see a cigarette in his mouth, and he burned a piece of my hair, and then he put out the cigarette," and she "could smell my hair burning and it stinked." L.D. also talked about a blanket that she could see, describing it as "hard" and the kind you use for moving. L.D. provided additional sensory details, including that she was on her back, Lehman's body was over her, his hands were on the truck, and "she talked about their bodies moving." L.D. reported that Lehman stopped when he had to go to the bathroom, and she saw him urinate between two trucks. L.D. told Parada that after both incidents, Lehman told L.D. not to tell anyone. L.D. also said she was twelve years old when this incident occurred. Parada estimated that the second incident occurred in 2018. However, L.D. turned twelve on August 26, 2017, and both Lehman and his fiancée, B.B., testified that Lehman and L.D. went to Walmart together in August 2017 when L.D. and her sisters were visiting Lehman's home.

Parada testified that L.D. was crying during the interview and said "I just want to forget it and never see him again." Parada also testified that, although L.D. has developmental delays, Parada felt L.D. "understood her questions correctly." She also saw no red flags during the interview to alert her that L.D. might not have been truthful.

In her testimony at trial, L.D. told the jury about five incidents of abuse by Lehman. She testified that Lehman touched her "boob" under her clothes on three different occasions. She also testified that when she was twelve years old, she and her sisters were swimming at Lehman's house and Lehman came up behind her in the pool and touched her "private part" under her clothes with his hand. L.D. had not disclosed those incidents to Parada during the forensic interview.

The fifth incident, however, described the incident at the mechanic's shop that comprised L.D.'s second outcry statement. Specifically, L.D. testified that she went with Lehman to Walmart and then to his shop so they could let the dogs out, go to the bathroom, and feed the dogs. She was excited to go with him because she loves animals. L.D. told the jury that, after she saw the animals, Lehman picked her up, sat her on top of the tailgate of a truck, pulled her pants down and her underwear, "and then he took his private part and put it in mine." L.D. described his "private part" as "what boys use to go pee." L.D. said that when Lehman put his private part inside her private part "It hurt. Like, it hurted me really bad." She also testified that she saw oil on the truck and "could smell oil, cigarettes, and him." She could smell cigarettes because "he just put out his cigarette" and did that "next to my hair and it caught my hair on fire." She told the jury "[m]y hair was just melting way." L.D. testified that when she said "Stop," Lehman said "It's okay, just let me do this." According to L.D., Lehman later stopped because he had to go to the bathroom. Lehman also told L.D. not to tell anyone in her family "or he will hurt my family."

L.D. first told the jury that she was twelve when this occurred, but then said she was ten years old when it happened.

L.D.'s mother testified that L.D. "hates" that she smokes and does not like the smell of cigarettes "because of the simple fact Don smokes cigarettes and Don put his hands on her and everything." She also testified that L.D. does not like their dogs barking "because she remembers in the background of when she was being touched [at Lehman's shop] that there was a dog barking."

According to L.D.'s therapist, Amy Bell[3], L.D. suffers from post-traumatic stress disorder (PTSD) as a result of the abuse. Bell testified that she began treating L.D. in September 2018, and was still treating L.D. at the time of trial. According to Bell, at the beginning of L.D.'s treatment, L.D. "was always super engaged in therapy, willing to talk about things," as long as they were not discussing topics related to sexual abuse. Bell told the jury that L.D. had become more comfortable sharing additional information about the abuse during their first year of therapy. Parada and Bell explained that victims of abuse go through a process of disclosure in which they disclose details about the traumatic event in stages. Suzanne Anderson, DCAC's Assistant Clinical Director, further explained that children wait to fully disclose trauma until they feel that it is safe to tell. Anderson told the jury that full

---

[3] The trial court designated Bell as an expert in child abuse without objection from Lehman.

disclosure sometimes takes months or even years because children give information "little by little until they feel safe to tell all of the information."

Although L.D. was fourteen years old at the time of trial, Bell testified that L.D. was developmentally closer to that of a ten or eleven year old. Bell also explained that when children recall traumatic experiences, their concept of time, distance, and location are affected and the child's recall is not always in chronological order. Any developmental delays makes it more difficult to get an organized and detailed disclosure. According to Bell, L.D. had been unable to give her time frames, but she "specifically talked about different senses that she had when the abuse was happening" such as what she was seeing, hearing, or smelling.

Lehman, his fiancée, his son, and his god daughter testified for the defense. Lehman and his fiancée, B.B., testified that she, Lehman, and their son, C.L., lived with L.D. and her family for about three months in 2012. Although B.B. recalled that Lehman and L.D. went to Walmart together in August 2017, B.B. testified that they were gone for only fifteen or twenty minutes. On cross-examination, she conceded that there were several times when Lehman and L.D. were "by themselves together." Lehman's twenty-one year old god daughter, H.G., testified that she had known Lehman since she was four and he "never did anything inappropriate" with her and was always "a real gentleman." H.G. testified that she had not seen L.D. since "she was a little kid," when L.D. was "around ten." But when L.D. was ten years old, she saw L.D. "trying to peek on" Lehman when he was using the

bathroom, taking a shower, or changing clothes. H.G. also said that she saw L.D. trying to pull Lehman's pants down in the pool during a pool party at Lehman's home to celebrate C.L.'s birthday. B.B. and Lehman, however, did not recall L.D. pulling Lehman's pants down at the pool party. B.B. testified that she remembered L.D. and her sisters swimming at her son's birthday party on July 22, 2017, but she did not notice anything unusual going on in the pool. Lehman remembered his swimming trunks coming off when he "pushed off the side of the pool," but he did not remember L.D. trying to pull his pants down in the pool. C.L.[4] testified that he remembered his dad's pants slipping off in the pool at his birthday party, and he saw his dad "goose" L.D. when they were getting out of the pool.

At trial, Lehman denied sexually assaulting L.D. "or any other minor" and testified that he never inappropriately touched L.D. He provided his own account of the incident at the shop. Lehman recalled L.D. going to Walmart and then the mechanic's shop with him once when she was twelve years old. Lehman testified that this occurred in August 2017 after L.D. and her sisters had spent the night at his home. Lehman told the jury that he was uncomfortable agreeing to let L.D. go to Walmart with him because of an incident that occurred previously when he, L.D., her father, and B.B. were in the living room talking. According to Lehman, L.D. was sitting on his left leg "[a]nd when I went to get up and remove her, she had to be

---

[4] C.L. was born in July 2006 and was thirteen years old at the time of trial. C.L. would have been turning eleven years old at the time of the July 2017 pool party.

pried off of me, being yelled at by her father and B.B." So when L.D. asked to go to Walmart with him, Lehman had L.D. ask B.B. for permission.

Lehman testified that he and L.D. spent just a few minutes in Walmart, then filled his truck up with gas, bought ice cream and drinks at the gas station, and then drove to the shop to feed the dogs. Lehman told the jury that this happened in August, and he told L.D. to stay in his truck because he would be quick at the shop. But Lehman said L.D. came into the shop anyway and "acted like she wanted to play chase or tag." He testified that he gave her a hug and at one point, she said "I love you," and then she kissed him on the lips. After that, Lehman said that L.D. went to the restroom while he fed his second dog outside. Then they left and drove back to his home.

## ANALYSIS

Lehman brings two issues on appeal. First, he maintains the evidence was legally insufficient to support the conviction. Second, he asserts the trial court erred by failing to instruct the jury that its verdict had to be unanimous. We will address each in turn.

## I.      Sufficiency of the Evidence

In his first issue, Lehman asserts the evidence was legally insufficient to support the conviction. We review the sufficiency of the evidence supporting Lehman's conviction under the *Jackson v. Virginia* standard. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (referencing *Jackson v. Virginia*, 443 U.S.

307 (1979)). Under this standard, reviewing courts " 'consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt.' " *Alfaro-Jimenez v. State*, 577 S.W.3d 240, 243–44 (Tex. Crim. App. 2019) (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)); *Jackson*, 443 U.S. at 319. "[T]he jury is the 'sole judge' of witnesses' credibility and the weight to be given testimony." *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021) (quoting *Garcia v. State*, 367 S.W.3d 683, 687 (Tex. Crim. App. 2012)). As the reviewing court, we defer to the jury in undertaking their responsibility to " 'fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (quoting *Hooper*, 214 S.W.3d at 13). The Court balances this deference to the jury with our duty to ensure the evidence "actually supports a conclusion that the defendant committed the crime that was charged." *Williams*, 235 S.W.3d at 750. We resolve evidentiary inconsistencies in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

To measure the sufficiency of the evidence, we compare the evidence produced at trial to "the elements of the offense as defined by the hypothetically correct jury charge for the case." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "accurately sets out the law, is

authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.* The law authorized by the indictment consists of the offense's statutory elements as modified by the indictment. *Clinton v. State*, 354 S.W.3d 795, 799 (Tex. Crim. App. 2011). As applicable here, a person commits the charged offense if the person intentionally or knowingly causes the sexual organ of a child under the age of fourteen to contact the sexual organ of another person, including the actor. *See* TEX. PENAL CODE. § 22.021(a)(1)(B)(iii), (a)(2)(B). It is undisputed here that L.D. was younger than fourteen years of age when each of the offenses alleged at trial occurred. That element is, therefore, not at issue on appeal.

The State presented evidence of two instances of genital-to-genital contact during which Lehman intentionally or knowingly caused his sexual organ to contact L.D.'s sexual organ. L.D. testified to only one of the incidents—the sexual assault on the truck's tailgate at Lehman's shop. Parada, however, testified that L.D. reported two such incidents during her outcry; the incident at the shop as well as a prior incident at her home. L.D.'s testimony alone was sufficient to support a conviction. *See Santamaria v. State*, No. 05-20-00051-CR, 2022 WL 1564704, at *2 (Tex. App.—Dallas May 17, 2022, no pet. h.) (mem. op., not designated for publication) (first citing TEX. CODE CRIM. PROC. art. 38.07(a), (b)(1); and then citing *Lee v. State*, 186 S.W.3d 649, 656 (Tex. App.—Dallas 2006, pet. ref'd)). Parada's

outcry-witness testimony was also sufficient to support the conviction. *See Martinez v. State*, 178 S.W.3d 806, 811 (Tex. Crim. App. 2005) (outcry witness may recite child's out-of-court statements concerning offense, and testimony is considered substantive evidence of a crime); *see also Edwards v. State*, No. 05-12-01398-CR, 2014 WL 2568489, at *7 (Tex. App.—Dallas June 9, 2014, no pet.) (mem. op., not designated for publication) (first citing *Rodriguez v. State*, 819 S.W.2d 871, 873 (Tex. Crim. App. 1991); then citing *Tear v. State*, 74 S.W.3d 555, 560 (Tex. App.—Dallas 2002, pet. ref'd)).

Lehman acknowledges that a child victim's testimony can support a verdict on its own. He urges this Court, however, to find that L.D.'s testimony was insufficient to support the conviction because she was not a credible witness. According to Lehman, L.D.'s testimony was not credible because she testified to four alleged incidents that she did not disclose to Parada, and testified to only one, not two, alleged incidents of genital-to-genital contact reported to Parada. Lehman also contends that L.D.'s testimony concerning the incident at Lehman's shop was inconsistent at trial and in conflict with her outcry statements. Lehman specifically takes issue with L.D.'s inconsistent testimony concerning her age at the time of the incident at Lehman's shop and her provision of additional details at trial concerning the incident. Lehman maintains that these perceived insistencies, along with an alleged lack of corroborating evidence and lack of DNA or medical evidence, show that L.D. was not telling the truth. Lehman also argues that L.D. lacked credibility

–13–

because she could not remember her sisters' ages, C.L.'s age, or that Lehman lived with her family at some point in the past. We disagree.

Lehman cites no authority and provides no argument explaining how his challenges to L.D.'s credibility affect the sufficiency of the evidence to support his conviction for aggravated sexual assault of a child younger than fourteen. Indeed, his arguments are contrary to Texas law. *See Santamaria*, 2022 WL 1564704, at *2. L.D.'s expanded trial testimony, any inconsistencies within her testimony, and any inconsistencies or conflicts between her outcry and her trial testimony are issues of weight and credibility resolved by the jury. *See Foster v. State*, No. 05-14-01186-CR, 2015 WL 8039901, at *2 (Tex. App.—Dallas Dec. 7, 2015, no pet.) (mem. op., not designated for publication) ("The significance of E.G.'s silence about the abuse until she was asked, the lack of eyewitness corroboration, and any inconsistencies in the testimony, are issues of weight and credibility resolved by the jury.") (citing *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011)). Indeed, the alleged inconsistencies in L.D.'s outcry and trial testimony amount to little more than questions of when the offenses occurred and what additional sensory details she was able to explain at trial. Bell explained, however, that any confusion on timeframes, was a symptom of the trauma suffered by L.D., part of the process of sexual abuse disclosure, and expected due to L.D.'s age and developmental delays. Moreover, those timeframes were immaterial here because there is no dispute that the offenses occurred when L.D. was younger than fourteen.

Further, corroborating testimony or physical evidence of the aggravated sexual assault was not required here because L.D. was a minor. *See* TEX. CODE CRIM. PROC. art. 38.07(b); *see also Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. [Panel Op.] 1978); *Tinker v. State*, 148 S.W.3d 666, 669 (Tex. App.—Houston [14th Dist.] 2004, no pet.). Nonetheless, the record includes evidence corroborating L.D.'s testimony. L.D. described the assault at the shop to Parada during her forensic interview. L.D.'s trial testimony concerning the incident at Lehman's shop, including the sensory details she provided, was consistent with her outcry statement. For example, at trial and during her outcry statement, L.D. consistently said that (1) the assault occurred on the tailgate of a truck parked in the shop where Lehman worked, (2) Lehman took her to the shop after taking her to Walmart, (3) Lehman put his penis inside of her vagina while on the tailgate, (4) it hurt her when he put his penis inside of her vagina, (5) she smelled cigarettes during the assault, (5) Lehman burned her hair with his cigarette, and (6) Lehman stopped the assault when he had to go to the bathroom. Lehman, his fiancée, and his son confirmed that Lehman and L.D. went to Walmart together sometime in the summer of 2017. We "give wide latitude to testimony given by child victims of sexual abuse." *Gonzalez Soto v. State*, 267 S.W.3d 327, 332 (Tex. App.—Corpus Christi–Edinburg 2008, no pet.). The child complainant's description of the abuse need not be precise. *Id.* This rule "reflect[s] the important public policy that we cannot expect the child victims of violent crimes to testify with the same clarity and ability as is expected of mature

–15–

and capable adults." *Villalon v. State*, 791 S.W.2d 130, 134 (Tex. Crim. App. 1990). Here, the jury could reasonably weigh the evidence and conclude that L.D. told the truth and was sexually assaulted by Lehman at the shop.

Lehman also contends that we should render a judgment of acquittal because he and his witnesses were more credible than L.D. The factfinder is tasked with resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts. *Tucker v. State*, No. 05-19-01515-CR, 2022 WL 1564554, at *5 (Tex. App.—Dallas May 18, 2022, no pet. h.) (mem. op., not designated for publication) (citing *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015)). The jury, as the sole judge of the credibility of the witness, is free to believe or disbelieve all or part of a witness's testimony. *Arnold v. State*, No. 05-15-00482-CR, 2016 WL 2733080, at *1 (Tex. App.—Dallas May 11, 2016, no pet.) (mem. op., not designated for publication) (citing *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011)). Here, the jury evaluated the weight and credibility of the witnesses and concluded that Lehman was guilty of aggravated sexual assault of a child under the age of fourteen beyond a reasonable doubt. Lehman's arguments challenging the credibility of L.D.'s testimony are not persuasive.

After reviewing the entire record, based on the cumulative force of all the evidence when viewed in the light most favorable to the verdict, considering the reasonable inferences to be drawn from that evidence, and deferring to the jury's determination of the credibility of the witnesses and the weight to be given their

–16–

testimony, we conclude that a rational trier of fact could have found the essential elements of the offense of aggravated sexual assault of a child beyond a reasonable doubt. We overrule Lehman's first issue.

## II.    Charge error

In his second issue, Lehman contends the judgment should be reversed because the trial court failed to instruct the jury that a unanimous verdict is required to convict a defendant of aggravated sexual assault of a child. He argues that the charge violated his constitutional right to a unanimous verdict.

Jury charge error requires reversal when the defendant has properly objected to the charge, and we find "some harm" to his rights. *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005) (internal citations omitted). Thus, we review alleged charge error by considering two questions: (1) whether error existed in the charge; and (2) whether sufficient harm resulted from the error to compel reversal. *Id.* When the defendant fails to object or states that he has no objection to the charge, however, we will not reverse for jury-charge error unless the record shows "egregious harm" to the defendant. *Id.* Here, Lehman did not object to the jury charge on this basis at trial. As such, if we conclude charge error occurred, then we review that error for egregious harm.

### A.    Existence of error

In Texas, a criminal defendant "has the right to a unanimous jury verdict on each element of the charged offense." *French v. State*, 563 S.W.3d 228, 233 (Tex.

Crim. App. 2018); *Ngo*, 175 S.W.3d at 745 ("Under our state constitution, jury unanimity is required in felony cases, and, under our state statutes, unanimity is required in all criminal cases."). "Texas law requires that a jury reach a unanimous verdict about the specific crime that the defendant committed." *Cosio v. State*, 353 S.W.3d 766, 771 (Tex. Crim. App. 2011). "This means that the jury must 'agree upon a single and discrete incident that would constitute the commission of the offense alleged.' " *Id.* (quoting *Stuhler v. State*, 218 S.W.3d 706, 717 (Tex. Crim. App. 2007)); *see also* TEX. CODE CRIM. PROC. art. 26.29(a) ("Not less than twelve jurors can render and return a verdict in a felony case. It must be concurred in by each juror and signed by the foreman."). It is error to authorize a jury to render a guilty verdict without reaching a unanimous decision as to each element of the charged offense. *Cosio*, 353 S.W.3d at 771.

The court of criminal appeals has recognized three variations that may result in non-unanimous verdicts as to a particular incident of criminal conduct that comprises the charged offense. *Cosio*, 353 S.W.at 772 (citing *Ngo*, 175 S.W.3d at 747–48). Under this precedent, non-unanimity may occur when the State does any of the following:

1. Presents evidence demonstrating the repetition of the same criminal conduct, but the actual results of the conduct differed;

2. Charges one offense and presents evidence that the defendant committed the charged offense on multiple but separate occasions. Each of the multiple incidents individually establishes a different offense or unit of prosecution.

–18–

3. Charges one offense and presents evidence of an offense, committed at a different time, that violated a different provision of the same criminal statute.

*Cosio*, 353 S.W.at 772–73 (internal citations omitted). Non-unanimity may result in each of these situations when the jury charge fails to properly instruct the jury, based on the indicted offense(s) and specific evidence in the case, that its verdict must be unanimous as to a "single and discrete incident that would constitute the commission of the offense alleged." *Id.* For example, in *Cosio*, the jury charge erroneously allowed for a non-unanimous verdict when there was evidence of multiple instances of misconduct supporting each count of aggravated sexual assault and indecency with a child. *See id.* at 770, 774. The "standard, perfunctory unanimity instruction," did not rectify the error because, although the jury could have believed it had to be unanimous about the offenses, the jury could have believed it did not have to be unanimous about the criminal conduct constituting the offenses. *See id.* at 774.

Here, the trial court's jury charge included two instructions regarding the requirement of unanimity. First, the concluding instructions noted the requirement of unanimity:

> After you retire to the jury room, you will select one of your members as your presiding juror. **It is the presiding juror's duty** to preside. at your deliberations, vote with you, and **when you have unanimously agreed upon a verdict, to certify to your verdict by using the appropriate form attached hereto** and signing the same as presiding juror

(emphasis added). The final instruction before the judge's signature stated that the jury should use the jury call button to summon a bailiff "[a]fter you have reached a

–19–

unanimous verdict or if you desire to communicate with the Court . . . ." The charge then provided a single verdict form with signature lines for only the presiding juror; there was no option for the jury to record a non-unanimous vote. Although the charge mentioned unanimity and provided no option for a non-unanimous verdict, the charge failed to instruct the jury that "the jury must agree upon a single and discrete incident that would constitute the commission of the offense alleged." *See Cosio*, 353 S.W.3d at 771.

The charge was similarly erroneous here. Although there was evidence that Lehman intentionally or knowingly caused his sexual organ to touch L.D.'s sexual organ on two occasions, the charge did not require unanimity regarding which of the sexual contacts the jury believed Lehman committed. We, therefore, conclude the charge was erroneous. *See Sullivan v. State*, No. 05-16-01138-CR, 2017 WL 6505861, at *3 (Tex. App.—Dallas Dec. 20, 2017, pet. dism'd) (charge erroneous where evidence showed multiple instances of sexual contact but charge "did not require unanimity regarding which of the sexual contact the jury believed appellant committed.").

## B.    Egregious harm

Having found charge error, we next analyze whether that error caused Lehman to suffer egregious harm. "An egregious harm determination must be based on a finding of actual rather than theoretical harm." *Cosio*, 353 S.W.3d at 777. Actual harm is established when the erroneous jury instruction affected "the very basis of

the case," "deprive[d] the defendant of a valuable right," or "vitally affect[ed] a defensive theory." *Id.* (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g)).

"An appellate court should examine four factors to determine whether an appellant was egregiously harmed by an erroneous jury instruction." *Arrington v. State*, 451 S.W.3d 834, 840 (Tex. Crim. App. 2015). Those factors are (1) the entire jury charge; (2) the state of the evidence, including contested issues and the weight of the probative evidence; (3) the parties' arguments; and (4) all other relevant information in the record. *Id.* This analysis is fact specific and is done on a "case-by-case basis." *Gelinas v. State*, 398 S.W.3d 703, 710 (Tex. Crim. App. 2013). Examining those factors, we conclude Lehman was not egregiously harmed.

### 1.     The entire jury charge

We first consider the entire jury charge. The charge's general references to unanimity failed to alert the jurors that they needed to unanimously find that Lehman committed a single, incident of contact between Lehman's sexual organ and L.D.'s sexual organ; thus, the general reference to unanimity in the charge did not cure the error. *See Cosio*, 353 S.W.3d at 773; *Smith v. State*, 515 S.W.3d 423, 430 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd). Under this record, we conclude the first factor favors finding egregious harm.

## 2. The state of the evidence

Next, we consider the state of the evidence. Under this prong, we determine whether the evidence made it more or less likely that the jury charge caused appellant actual harm. *Flores v. State*, 513 S.W.3d 146, 159 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd). We must determine "the likelihood that the jury would in fact have reached a non-unanimous verdict on the facts of [this] particular case." *Jourdan v. State*, 428 S.W.3d 86, 98 (Tex. Crim. App. 2014). Lehman argues that this factor favors a finding of egregious harm because the evidence included allegations of different types of contact that could establish the elements of proof to convict for aggravated sexual assault of a child. Specifically, Lehman references L.D.'s testimony of five alleged incidents of assault, only one of which alleged genital-to-genital contact. We disagree.

The application paragraph of the jury charge specifies that to find Lehman guilty of aggravated sexual assault of a child, the jury was required to find beyond a reasonable doubt that Lehman intentionally or knowingly caused the contact of L.D.'s sexual organ by his sexual organ. The State presented evidence of two, alleged incidents of genital-to-genital contact. L.D. testified to one of those incidents. Lehman's own testimony and that of his defense witnesses confirmed many of the details of L.D.'s testimony and outcry, including that Lehman took L.D. to Walmart and his shop when she was twelve years old. The defense witnesses' remaining testimony consisted primarily of character testimony to boost Lehman's

credibility and testimony attempting to show that L.D., at the age of ten or twelve, was the sexual aggressor. Viewing the state of the evidence, we conclude it is unlikely that the evidence of other alleged offenses resulted in a non-unanimous verdict as to the offense charged in the indictment.

Further, Lehman did not argue that he was guilty of only one of the allegations. Instead, his trial strategy left the jury with an all or nothing decision—either he was guilty or he was not. In finding him guilty the jury necessarily found L.D. credible and disbelieved Lehman's defensive evidence. *See Arrington*, 451 S.W.3d at 842 ("The jury in this case, after hearing all the evidence clearly credited [the complainant's] story and did not believe appellant's categorical denial of all accusations."). If the jury had believed Lehman, it would have acquitted him. *See Hinojosa v. State*, No. 13-18-00601-CR, 2020 WL 582155, at *4 (Tex. App.—Corpus Christi–Edinburg Feb. 6, 2020, no pet.) (mem. op., not designated for publication). We conclude that the state of the evidence made it less likely that the jury charge caused appellant actual harm. *See Cosio*, 353 S.W.3d at 778; *see also Sullivan*, 2017 WL 6505861, at *4. This factor, therefore, weighs against finding egregious harm. *See Bell v. State*, No. 05-13-01616-CR, 2015 WL 1648001, at *4 (Tex. App.—Dallas Apr. 10, 2015, pet. ref'd) (mem. op., not designated for publication) (citing *Arrington*, 451 S.W.3d at 842, 844); *Ruiz v. State*, 272 S.W.3d 819, 826–27 (Tex. App.—Austin 2008, no pet.) (concluding that the state of the evidence weighed against finding egregious harm when defendant did not argue that

–23–

he was guilty of only some of the allegations of abuse, but instead argued that he had not committed any of the alleged conduct, leaving the jury with a "all-or-nothing" decision).

### 3.     The parties' arguments

Turning to the parties' arguments, we look to whether any statements made by the State, appellant, or the trial court during the trial exacerbated or ameliorated error in the charge. *See Arrington*, 451 S.W.3d at 844. Here, neither the State nor defense counsel made any reference to a unanimity requirement. Similarly, neither side told the jury that they need not be unanimous. As such, this factor does not weigh for or against an egregious-harm finding. *See Smith v. State*, 515 S.W.3d 423, 431 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd) (citing *Arrington*, 451 S.W.3d at 844; then citing *Cosio*, 353 S.W.3d at 777).

### 4.     Other relevant information

Finally, we review the record for other relevant information that may require consideration, such as whether the jury rejected one of multiple counts or sent requests for clarification during deliberations. *See Smith*, 515 S.W.3d at 431. The record reveals no jury notes or any other indication that the jury sought any clarification regarding unanimity. The final factor, therefore, does not weigh in favor of or against finding egregious harm. *See id.*

Lehman argues this factor supports a finding of egregious harm because the State did not elect which specific incident it relied upon for conviction. This

argument is unpersuasive. First, we note that Lehman did not request below that the State make an election, and he does not argue on appeal that the trial court erred by not ordering the State to make an election. Instead, he contends the lack of an election confused the jury and supports his contention that he suffered egregious harm. The Texas Court of Criminal Appeals rejected this argument in the context of a harmless error analysis in *Owings v. State*, 541 S.W.3d 144 (Tex. Crim. App. 2017). In *Owings*, the indictment alleged one offense describing one act of genital-to-genital contact, but the complainant testified to more than one act of genital-to-genital contact. *Id.* at 150. On appeal, the defendant complained that the trial court committed harmful constitutional error when it failed to require the State to elect which specific instance of sexual abuse it relied upon for conviction. *Id.* at 149. The court of appeals agreed, but the court of criminal appeals did not. Although the *Owings* court concluded that "the trial court erred by not requiring the State to elect the act of genital-to-genital contact upon which it would rely for a conviction," the court found the error harmless. *Id.* at 150. One factor considered by the court in its harm analysis was whether the error resulted in a non-unanimous verdict. *Id.* The court concluded "we are confident that the State's failure to elect did not result in a non-unanimous verdict." *Id.* In its unanimity analysis, the court remarked on the similarity of the incidents that the State could have relied upon for the conviction and explained that the risk of a non-unanimous verdict was low:

> Although, theoretically, it could be said that some jurors could convict based only on the one incident in Uncle Ty's room, some jurors could convict based only on the one incident in Appellant's father's house, and some jurors could convict based only on one of the multiple incidents in Appellant's bedroom, the likelihood of that is almost infinitesimal. The prosecution's case depended on the credibility of K.M. Appellant's defense was that the sexual abuse did not occur at all. There is no basis anywhere in the record for the jury to believe that one incident occurred and another did not. Either they all did or they all did not. Thus ... there was no danger here that some jurors might have believed that one incident occurred and another or others did not.

*Id.* The same analysis applies here.

The State presented evidence as to each element of the charged offense, the two incidents were similar, and Lehman denied the allegations of any sexual contact. Here, as in *Owings*, the record does not support the conclusion that the jury could believe that one incident occurred but not the other. Nothing in the record indicates that the verdict was not unanimous. Accordingly, this factor weighs against a finding of egregious harm.

### 5.     No egregious harm shown

The only factor that weighs in favor of finding egregious harm is the consideration of the jury instructions. After considering and weighing all of the relevant factors, we conclude that the lack of a proper unanimity instruction did not cause actual harm to appellant *See Cosio*, 353 S.W.3d at 777–78 (no egregious harm even though the jury instructions also weighed in favor of finding egregious harm); *see also Bell v. State*, No. 05-13-01616-CR, 2015 WL 1648001, at \*4–5 (Tex.

App.—Dallas Apr. 10, 2015, pet. ref'd) (citing *Arrington*, 451 S.W.3d at 845). We overrule Lehman's second issue.

## CONCLUSION

Under this record, we conclude the evidence was sufficient to support the conviction, and Lehman was not egregiously harmed by the trial court's failure to instruct the jury as to unanimity. Accordingly, we overrule Lehman's appellate issues and affirm the judgment.

/Robbie Partida-Kipness/
ROBBIE PARTIDA-KIPNESS
JUSTICE

191367f.u05
Do Not Publish
TEX. R. APP. P. 47.2(b).



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

DONALD NOLAN LEHMAN, Appellant

No. 05-19-01367-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 7, Dallas County, Texas Trial Court Cause No. F-1876726-Y. Opinion delivered by Justice Partida-Kipness. Justices Myers and Pedersen, III participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 15th day of June 2022.